564 A.2d 280

**COMMONWEALTH of Pennsylvania Acting by Attorney General LeRoy S. ZIMMERMAN, Plaintiff,**

**v.**

**FIRST FINANCIAL SECURITY, INC. and James E. Farrior, Individually and as President of First Financial Security, Inc. and Frank May, Individually and as Chairman of the Board of First Financial Security, Inc., Defendants.**

Commonwealth Court of Pennsylvania.

Argued June 9, 1989.

Decided Sept. 26, 1989.

John J. Calabro, Deputy Atty. Gen., Ernest D. Preate, Jr., Atty. Gen., John E. Kelly, Bureau of Consumer Protection, Philadelphia, for Com. of Pa.

Norman F. Caplan, Langhorne, for First Financial Sec., Inc. and James E. Farrior.

Before CRUMLISH, Jr., President Judge, and BARRY (P.) and McGINLEY, JJ.*

* This matter was argued before a panel consisting of Judge Barry, Judge McGinley, and Senior Judge Kalish. Due to the untimely death of Senior Judge Kalish, the case was submitted on the briefs to President Judge Crumlish, Jr., for his consideration as a member of the panel.

McGINLEY, Judge.

Before us is a motion for post-trial relief filed by the Commonwealth, acting by Attorney General Leroy S. Zimmerman, through the Bureau of Consumer Protection (Commonwealth) seeking to vacate a decree nisi entered by this Court which concluded that defendants First Financial Security, Inc. (FFS), James E. Farrior, President of FFS (Farrior) and Frank May, Chairman of the Board of FFS (May) have not violated any of the provisions of the Unfair Trade Practices and Consumer Protection Law (Consumer Law)[1] and requesting that this Court enter an order permanently enjoining the methods, acts and practices of the defendants in this Commonwealth.

On July 1, 1988, the Commonwealth filed a complaint in equity seeking to restrain the methods, acts and practices of FFS and its principal officers, Farrior and May. On August 11, 1988, the Commonwealth and the defendants entered into a consent petition for a preliminary injunction which was approved by this Court.

This Court subsequently held a hearing on the Commonwealth's motion for a permanent injunction. On February 17, 1989, Senior Judge Lehman entered a decree nisi denying the Commonwealth's motion for a permanent injunction and dissolving the preliminary injunction which had been entered by mutual consent.

The Commonwealth filed a timely motion for post-trial relief alleging this Court erred in concluding that defendants FFS, Farrior and May did not violate the Consumer Law. Specifically, the Commonwealth contends that defendants have: 1) established and promoted a pyramid club in violation of Section 2(4)(xiii) of the Consumer Law;[2] 2)

1. Act of November 24, 1976, P.L. 1166, *as amended,* 73 P.S. §§ 201–1—201–9.2.

2. Section 2(4)(xiii) of the Consumer Law, 73 P.S. § 201–2(4)(xiii) provides:

> (4) *"Unfair methods of competition"* and "unfair or deceptive acts or practices" mean any one or more of the following:
> (xiii) Promoting or engaging in any plan by which goods or services are sold to a person for a consideration and upon the

marketed their program in a manner which is otherwise in violation of Section 2(4)(xvii) of the Consumer Law;[3] and 3) failed to register to do business in the Commonwealth in violation of Sections 201(4)(ii), (iii) and (xvii) of the Consumer Law.[4]

In a decision accompanying the decree nisi, this Court, per Senior Judge Lehman made the following findings of fact:

1. The plaintiff is the Commonwealth of Pennsylvania, acting by Attorney General LeRoy S. Zimmerman, through the Philadelphia office of the Bureau of Consumer Affairs.

2. Defendant, First Financial, is a registered Georgia corporation with a principal place of business located in Atlanta, Georgia.

further consideration that the purchaser secure or attempt to secure one or more persons likewise to join the said plan; each purchaser to be given the right to secure money, goods or services depending upon the number of persons joining the plan. In addition, promoting or engaging in any plan, commonly known as or similar to the so-called "Chain–Letter Plan" or "Pyramid Club." The terms "Chain–Letter Plan" or "Pyramid Club" mean any scheme for the disposal or distribution of property, services or anything of value scheme for the disposal or distribution of property, services or anything of value whereby a participant pays valuable consideration, in whole or in part, for an opportunity to receive compensation for introducing or attempting to introduce one or more additional persons to participate in the scheme or for the opportunity to receive compensation when a person introduced by the participant introduces a new participant. As used in this subclause the term "consideration" means an investment of cash or the purchase of goods, other property, training or services, but does not include payments made for sales demonstration equipment and materials for use in making sales and not for resale furnished at no profit to any person in the program or to the company or corporation, nor does the term apply to a minimal initial payment of twenty-five dollars ($25) or less;....

**3.** Section 2(4)(xvii) of the Consumer Law, 73 P.S. § 201–2(4)(xvii) provides that unfair or deceptive acts or practices includes: "[e]ngaging in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding.

**4.** 73 P.S. §§ 201–2(4)(ii), (iii) and (xvii).

3. First Financial is not registered to do business in this Commonwealth as required by the Business Corporation Law.

4. Defendant James E. Farrior, an adult individual, is the President of First Financial.

5. Defendant, Frank May, an adult individual, is the chairman of the board of First Financial.

6. Since the Commonwealth's complaint was filed, First Financial has ceased doing business in Pennsylvania.

7. Defendants, through advertisements in various media, solicit consumers to attend sales presentations designed to encourage them to become "members" of First Financial.

8. Memberships in First Financial, costing $100, are sold by 'distributors.'

9. To become eligible for the credit card a member sponsors at least five other consumers who in turn pay $100 to become members.

10. In order to be eligible to sponsor new members, one must first become a distributor.

11. Each original distributor receives a $25 commission for each new member he sponsors into First Financial who then becomes his level one distributor.

12. There is no limit on the number of new member/distributors any distributor may initially sponsor.

13. Each level one distributor thereafter is entitled to sponsor an additional unlimited number of other participants (level two), each of who is also entitled to sponsor an unlimited number of participants (level three), and so on through five levels.

14. Each distributor receives a $5 commission for each member/distributor sponsored into the program by a distributor in his downline (levels two through five).

15. The written sales presentation provided to potential member/distributors by defendants describing potential income assumes the original distributor and distribu-

tors in his downline will each sponsor five additional member/distributors.

16. Based on defendants' assumptions, the number of participants in only a single downline is as follows:

| | | | |
|---|---|---|---|
| Original Distributor | | 1 x 5 = | 5 |
| Level 1 | | 5 x 5 = | 25 |
| Level 2 | Downline | 25 x 5 = | 125 |
| Level 3 | " | 125 x 5 = | 625 |
| Level 4 | " | 625 x 5 = | 3,125 |
| Level 5 | " | 3,125 x 5 = | 15,625 |
| TOTAL PARTICIPANTS INVOLVED | | | 19,531 |

17. Each of the 19,531 distributors involved in the original downline, regardless of his position in another person's downline, will immediately begin his own downline and enlist 5 new distributors who will each sponsor 5 new participants and so on through 5 levels.

18. In order for all distributors in the original distributor's downline to receive their full commission, the total number of necessary participants would be 381,461,761.

19. It is not required that a person pay $100 to become a distributor. Persons could become distributors simply by filing an application.

20. For $100, a person received certain benefits, including group rates in health, auto and life insurance plans, travel discounts, and car lease discounts.

21. Forty to fifty Pennsylvania consumers paid defendants $75 to $100 to participate in defendants' organization.

22. Defendants paid refunds to 5–7% of the Pennsylvania consumers who participated in defendants' organization.

23. Ninety percent of Pennsylvania consumers who participated in defendants' organization received or requested a secured or guaranteed credit card.

24. Although no Pennsylvania consumer who participated in defendants' organization received the benefits or defendants' "purchase power plus," which included discounts on major medical and dental insurance, long term

care insurance, cancer insurance and discounts on the sale or lease of automobiles, said benefits were available to anyone who wanted to avail themselves of such benefits.

Opinion of Senior Judge Lehman, filed February 17, 1989, at 2–6.

After making the above findings of fact, this Court stated that defendants' business resembles an illegal referral sales scheme in every aspect except for the requirement that an individual purchase something to become a distributor of the defendants' product. We reasoned that although distributors received compensation for selling memberships and thereby introducing additional persons into the scheme, a person need not pay a fee to become a distributor. Therefore the requirement in Section 2(4)(xiii) of the Consumer Law that a participant pay valuable consideration for an opportunity to receive compensation from introducing additional persons to participate in the scheme had not been met. Consequently, this Court held that FFS and its officers did not violate the Consumer Law.

The Commonwealth's first contention in their motion for post-trial relief is that defendants' program, as marketed, is a pyramid club despite defendants' attempt to separate the membership and distributorship aspects of their organization.

After further review of the language Section 2(4)(xiii) of the Consumer Law and the findings of fact made by this Court, we must conclude that defendants' program is in fact a pyramid or referral sales scheme as contemplated by the Consumer Law. As we interpret Section 2(4)(xiii), that provision would be violated if an individual pays valuable consideration for an opportunity to receive compensation for introducing additional persons into the scheme. In this case, an integral component of defendants' plan is the generation of income by establishing a down-line organization comprised of participants who join as member/distributors. (*See* Finding of Fact No. 16 herein.) If distributors joined FFS only as distributors and did not purchase mem-

berships, they would not be able to build a down-line. As a result, the only commission a distributor would receive would be from his own direct sales.

However, in addition to the $25.00 commission a distributor receives from each direct sale of a membership, each distributor receives another $5.00 "override" for each membership sold by that member when he becomes a distributor. Furthermore, at the hearing, May testified that if any member wanted to sell a membership, but was not a distributor he would be paid a commission if he wanted it. (Notes of Testimony, November 27, 1988, (N.T.) at 39.)

Clearly, FFS distributors may only receive the upward flow of $5.00 override commissions if distributors join the program as member/distributors which in turn requires the purchase of a $100.00 membership. The fact that participants who join FFS only as distributors are not covered by the Consumer Law is inconsequential because May also testified that if everyone became a distributor and no one became a member, FFS would be out of business. (N.T. at 40.)

In short, in order for a distributor to realize any of the potential income benefits resulting from his participation in the FFS plan beyond commissions from his direct sales, there is a *de facto* requirement that participants in his five level down-line organization join as both members and distributors which necessarily involves the purchase of a $100.00 membership in order to sell memberships. Also, the fact that a member can expect to receive a commission from selling memberships without becoming a distributor renders the member/distributor distinction meaningless for those participants who purchase memberships. Accordingly, we conclude that the sales of memberships as marketed by defendants whose members and/or distributors are compensated by an upward flow of commissions through multi-level down-line organizations is a violation of Section 2(4)(xiii) of the Consumer Law.

Having found that defendants' referral sales scheme is in violation of Section 2(4)(xiii) of the Consumer Law, we need not address the other issues raised by the Commonwealth.

The decree nisi is vacated and defendants, their agents, successors, distributors, members and all other persons acting on defendants' behalf either directly or through any corporation are permanently enjoined from selling memberships in that the sale of said memberships violates Section 2(4)(xiii) of the Consumer Law for the reasons set forth herein.

## ORDER

AND NOW, this 26th day of September, 1989, the decree nisi entered in the above-captioned proceeding is vacated and defendant FFS, its principal officers James E. Farrior, and Frank May, their agents, successors, distributors, members and all other persons acting on defendants' behalf either directly or through any corporation are permanently enjoined under Section 2(4)(xiii) of the Consumer Law, 73 P.S. § 201–2(4)(xiii) from selling memberships in the Commonwealth of Pennsylvania for the reasons set forth in the foregoing opinion.